UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARK WILLIAMS, as Personal Representative of the Estate of Shane P. Williams, and a married man as his separate property,<br><br>Plaintiff,<br><br>v.<br><br>KITSAP COUNTY, a municipal corporation; BEN HERRIN and JANE DOE HERRIN, husband and wife, and the marital community comprised thereof; and PAUL WOODRUM and JANE DOE WOODRUM, husband and wife, and the marital community comprised thereof,<br><br>Defendants. | No. 08-05430-RBL<br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. #4). Plaintiff opposes Defendants' motion, and asks that, with respect to the claim against Kitsap County under 42 U.S.C. § 1983, the Court should continue the motion for four months to allow Plaintiff to conduct further discovery. (Dkt. #14.) For the reasons stated below, Defendants' Motion for Summary Judgment is DENIED. Plaintiff's motion to extend discovery on the claim against Kitsap County is GRANTED IN PART.

ORDER- 1

# I. BACKGROUND

The case arises from a confrontation between twenty-six year old Shane Williams and Kitsap County Sheriff's Deputies Ben Herrin and Paul Woodrum on May 16, 2006. The general sequence of events that took place during the early morning hours of May 16, 2006 is clear. However, the parties contest particular details of the encounter, and they have submitted voluminous materials supporting their respective versions of the facts.

Williams lived with his mother, Cecilia Gould, and her husband at 3742 'E' Street in Bremerton, Washington. (Decl. of Gould, Dkt. #12, ¶ 2.) According to his mother, Williams suffered from mental illness and was recovering from drug addiction. *Id*. On May 15, 2006, Williams's mother observed him playing with his daughter Kyla during the day at their house, and "was sure that [he] had turned a corner" in his life. (*Id*. at ¶ 5.) At 4:00 a.m. the next day, 911 dispatch ("CenCom") received a call from Williams, who stated "I need a Cop at 3742 'E' Street." Ben Herrin, Deputy for the Kitsap County Sheriff's Department, was notified of the call by "CenCom" and proceeded to the 'E' Street address.

Deputy Herrin testified that he located the 'E' Street residence and observed Williams sitting on the front porch. He parked his car and approached Williams, who stood up and started walking down the steps of the porch. Herrin stated that Williams underhand-lobbed an object at him, and said something to the effect of "Here's your chicken soup." (Herrin Tr. 32:21–25.) He turned his body, and Deputy Herrin observed that he held a machete in his right hand, which was pointing downward and parallel with his right leg. (*Id.* at 33:15–34:4.) Williams began to approach him, and he walked backwards away from Williams until he reached the rear of his patrol car. (*Id.* at 33:18–34:5.) Herrin stated that as Williams continued to advance towards him, he told him to drop his weapon and get on the ground. (*Id.* at 38:17–20.)

Deputy Herrin also testified that as Williams "got closer towards the road . . . he started bringing the machete up and swinging it back and forth," and while Williams was holding the

ORDER- 2

machete up, he was hitting his chest with his left hand. (*Id.* at 40:7–10.) Deputy Woodrum arrived at the scene while, according to Herrin, Williams continued to advance. (*Id.* at 43:3–4.) Herrin asked Woodrum if he had a Taser, to which Woodrum replied that he did not. (*Id.* at 45:4.) Both deputies testified that they yelled at Williams to drop the machete. Deputy Woodrum said something to the effect of "I'm going to shoot him," and according to Woodrum, Williams yelled something like "let's go" or "let's do it" before they opened fire. (Woodrum Tr. 42:1–7.) Herrin fired six shots and Woodrum fired four. Williams was struck with nine of the ten rounds. According to Woodrum, when Williams was shot, the machete landed close to his body. (*Id.* at 49:1–4.) Deputies Herrin and Woodrum testified that they were approximately 15 to 20 feet away from Williams when they shot him.

Plaintiff's principal factual contentions are that Williams (1) was not holding the machete when he was shot; (2) even if he was holding the machete, he was not threatening the deputies. Plaintiff disputes the Defendants' version of the facts by pointing to inconsistencies in the deputies' recollection of the events, including the fact that Woodrum did not remember Williams banging his chest when interviewed by the Office of Professional Standards on October 11, 2006. (Dkt. #15, Ex. 2 at 4.) Plaintiff also points out that Woodrum "never mentioned anything in [his] three statements about moving the machete once Shane was on the ground," and that he stated for the first time during his deposition that he moved the machete "a couple feet" away from Williams's body after the shooting. (Dkt. #14.)

Additionally, Plaintiff submits the testimony of witnesses, whose versions of the events vary from the deputies' versions. Brian Cain lived in an apartment overlooking the area where Williams was shot. He testified that Williams, before he was shot, stood still with his hands in the air and said "Here I am, here I am." (Cain Tr. 23:6–8; 24:20–24.) He also had no recollection of there being anything in Williams's hands. Richard Denis testified that he saw a law enforcement agent move the machete with his foot, four or five feet closer to Williams's body. (Denis Tr. 15:15-17; 16:14.)

ORDER- 3

Plaintiff also submits testimony from Detective Presba, who calculated the distance between Williams's body and the point to which Richard Denis testified that he observed a law enforcement officer move the machete, to be approximately ten feet. (Presba Tr. 35:4–20.)

This action followed. Defendants include Kitsap County, the deputies, and the deputies' marital communities. Plaintiff's Complaint asserts claims of: assualt; battery; negligence; outrage; excessive force in violation of Fourth Amendment to the United States Constitution; and violation of Article 1, Section 3, of the Washington State Constitution.

Defendants have moved for summary judgment. They seek qualified immunity for their actions and request dismissal of all of Plaintiff's claims against them.

## II. AUTHORITY

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

## III. DISCUSSION

Defendants seek summary dismissal of all of Plaintiff's claims against the Defendants. Defendants argue that Deputies Herrin and Woodrum are entitled to state and federal qualified

ORDER- 4

immunity from liability for their actions. Under the Defendants' version of the facts, the deputies were justified to shoot, and under the Plaintiff's version of the facts, the deputies shot Williams in cold blood. While the Defendants' version may be proven correct at trial, this Court can not, and will not rule, as a matter of law, that a reasonable jury could not agree with Plaintiff's view of the encounter between Williams and Kitsap County Sheriff's Deputies Herrin and Woodrum. Defendants also argue that "there is no basis in law or fact for Monell liability" against the County. (Dkt. #4.) For the following reasons, Defendants' Motion for Summary Judgement on all claims is DENIED.

**A.  Claims against Deputies Herrin and Woodrum**

Government officials are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872–73 (9th Cir. 1993).

In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. The privilege of qualified immunity is immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Id*.

To determine the constitutionality of a seizure, the court must "balance the nature and quality

ORDER- 5

of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696 (1983). *See also Graham v. Connor*, 490 U.S. 386, 396 (1989). In excessive force cases, the inquiry is whether the officers' conduct was "objectively reasonable under the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); *Tennesse v. Garner*, 471 U.S. 1 (1985). Relevant factors in the reasonableness inquiry include, but are not limited to, (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is evading or resisting arrest. *Graham*, 490 U.S. at 396.

Viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could conclude that Williams was unarmed when the deputies shot him, and that the deputies use of force was excessive. Because the machete lay some fifteen feet from Williams's body,[1] a reasonable jury could conclude that Williams dropped the machete before the deputies opened fire. The deputies had no evidence that Williams had committed any crimes, or perpetrated any acts of violence against other persons. While Williams was not complying, at least initially, with the deputies' requests to drop the machete, he was not a flight risk and was not actively resisting arrest. There were no innocent bystanders to the incident who were threatened serious bodily injury by Williams. Moreover, if Williams had dropped the machete, any safety risk to the deputies was certainly less than serious bodily injury or death. Lastly, Brian Cain's testimony indicates that Williams was not approaching the deputies in a threatening manner, but rather was standing still with his arms up. When viewed in the light most favorable to the Plaintiff, the deputies' use of deadly force was not "objectively

---

[1] Fifteen feet is the distance the machete lay from Williams's body, when viewing the facts in the light most favorable to the Plaintiff. Richard Denis testified that he saw a law enforcement agent move the machete with his foot, four or five feet closer to Williams's body, approximately two hours after the incident. (Denis Tr. 15:15-17; 16:14.) Plaintiff also submits testimony from Detective Presba, who calculated the distance between his body and the machete to be approximately ten feet at around 6:45 a.m.. (Presba Tr. 35:4–20).

ORDER- 6

reasonable" under the circumstances, and therefore violated the 4th Amendment.

The second inquiry for qualified immunity purposes is whether, at the time of the officers' actions, it was "clearly established" that they were violating Williams's Fourth Amendment rights. *See Brosseau*, 543 U.S. at 198. Plaintiff relies on *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Doerle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), in contending that the law "clearly established" that a reasonable officer would know that the use deadly force against Williams was excessive and therefore violated Williams's constitutional protection from unlawful seizures.

In *Garner*, the Court held that a Tennessee statute was unconstitutional insofar as it allowed the use of deadly force against a unarmed, nondangerous, fleeing suspect. *Garner*, 471 U.S. at 1. More specifically, the Court held that an officer may employ deadly force only if the suspect poses a significant threat of death or serious physical injury to himself or others. *Id.* In *Doerle*, the court held that an officer who employed the use a of a lead-filled beanbag capable of serious bodily injury was not entitled to qualified immunity. *Doerle*, 272 F.3d 1272 at 1286. The suspect was shot while walking towards the officer "at a steady gait, carrying only a bottle or a can in his hand." *Id*. at 1281. In holding that the officer was not entitled to qualified immunity, the court relied on the fact that the suspect was emotionally disturbed, had not attacked anyone, and had not committed any serious offense. *Id.* at 1281-83.[2]

This case involves the application of clearly established principles; when viewing the facts in the light most favorable to the Plaintiff, it would have been clear to a reasonable officer that his or her conduct violated Williams's Fourth Amendment rights. The nature of the conduct for which Williams was stopped, the level of the threat he presented as an unarmed individual immediately before he was shot, and the lack of warning that deadly force would be used, all support the

---

[2] The *Doerle* court stated that "[e]ven when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."

ORDER- 7

Plaintiff's position that the level of force was excessive in light of the threat posed and the governmental interest sought to be protected.

In this case, like in *Doerle*, the suspect's erratic behavior indicated that he may be emotionally disturbed, and there was little effort on behalf of the officers to "talk him down." The deputies testified that they yelled at Williams to drop his machete, but they did not testify that they warned him that they would shoot if he did not comply. Most importantly, Williams did not pose a threat of death or serious bodily injury to the deputies, as the Court in *Garner* requires, if he was not holding the machete before he was shot.

Defendants cite *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005), in support of their argument that even if the deputies violated the Fourth Amendment, it was not clearly established that the deputies' use of deadly force was unconstitutional. In that case, the court held that the police officers, who shot a suspect armed with a sword, were entitled to qualified immunity. *Id.* at 1119. The court stated that the officers' use of deadly force was reasonable under the following circumstances:

> Blanford was armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands by raising the sword and grunting, refused to let go of the sword in hand, and was intent upon trying to get inside a private residence or its backyard with the sword in hand.

*Id.* at 1117–1118. This case, however, is distinguishable from *Blanford* because there is a question of fact as to whether Williams was actually armed at the moment the deputies opened fire. Additionally, unlike in *Blanford*, there is no evidence in this case that the deputies warned Williams that they would shoot if him if he did not drop his machete, and there is evidence that he stood still, or nearly still, before he was shot.[3]

---

[3] The *Blanford* court stated that the third volley "was the most difficult" to analyze because Blanford had already been injured by the deputies' shots, there were no known bystanders in the vicinity, and Blanford may have been holding the sword in a non-threatening manner. Nonetheless, the court held that the deputies' actions were objectively reasonable, in part, because Blanford did not stop moving. *Id.* at 1118.

ORDER- 8

Thus, Williams's Constitutional right against the use of excessive force in such circumstances was, in this Court's view, clearly established at the time of the deputies' actions. There was little or no effort to "talk down" Williams or warn him that they would shoot. There is also evidence that Williams stood still and did not continue to advance towards the deputies. Most importantly, there is an issue of fact as to whether he was holding the machete in his hands before the deputies opened fire. While the Court is aware of, and agrees with the reasons for qualified immunity, for the reasons discussed above, the Defendants' Motion on qualified immunity in this case is DENIED.[4]

Defendants also argue that Deputies Herrin and Woodrum are entitled to state common law qualified immunity. (Dkt. #4.) Under Washington law, police officers are entitled to qualified immunity when they (1) are carrying out a statutory duty; (2) acting according to the procedures dictated by statute and their superiors; and (3) acted reasonably. *Estate of Lee v. City of Spokane*, 101 Wn. App. 158, 177, 2 P.3d 979 (2000). The Court agrees with Plaintiff, and concludes that because there is an issue of material fact as to whether the deputies acted reasonably in employing deadly force, there is similarly an issue of fact as to whether the deputies "acted reasonably" under the state qualified immunity analysis. Thus, Defendants are not entitled to state common law qualified immunity.

**B.     Claims Against Kitsap County**

Defendants seek dismissal of Plaintiffs' § 1983 claim against Kitsap County under *Monell v. N.Y. City Dep't of Soc. Services*, 436 U.S. 658 (1978). Under *Monell*, a municipality can only be liable for the deprivation of a constitutional right when its policy or custom caused the deprivation. *Monell*, 436 U.S. at 694. Defendants argue, correctly, that a municipality cannot be held liable for a

---

[4] Plaintiff filed a surreply (Dkt. #25) requesting that the Court should disregard portions of the declarations filed by Defendants. The Court reaches this decision without considering those portions of the declarations. Thus, Plaintiff's request that the Court disregard them is moot.

ORDER- 9

§ 1983 claim based solely on the actions of the deputies under a *respondeat superior* theory. (Dkt. #18.) In response, Plaintiff asks the Court to grant a discovery continuance, allowing the Plaintiff to conduct further discovery "to determine if the County's failure . . . to enforce its own policies concerning training and discharge of firearms, caused the shooting and killing of Shane Williams." (Dkt. #14.)

The Court does not agree with Defendants' assertion that such evidence is "the object of pure speculation, " nor can the Court deny Plaintiff's request for a Fed. R. Civ. Pro. 56(f) continuance because the evidence is "certainly nonexistent." *See VISA Int'l Serv. Ass'n v. Bankcard Holders of America*, 784 F.2d 1472, 1475 (9th Cir. 1986) (denial appropriate where evidence sought is object of pure speculation or is almost certainly nonexistent). Rather, the Court permits the Plaintiff to continue discovery of evidence that would establish liability under § 1983 based on a policy or practice of the County. The Court concludes that the Plaintiff has made a minimal, but sufficient, showing of evidence that there was a "lack of institutional control." Herrin testified that he "just knew" that the protocol was not to prepare a report after the shooting (Herrin Tr. 62:22–64:5), while the County Sheriff's Policy Manual (Dkt. #18, Exhibit H) requires a deputy to file a written report at "the earliest opportunity" after the use of deadly force. The Court hereby GRANTS a 90 day discovery continuance to determine whether the County's policies or customs lead to the use of excessive force. Defendants' Motion for Summary Judgment on the claim against Kitsap County is therefore DENIED.

**IV. CONCLUSION**

Defendants move for Summary Judgment, requesting that the Court dismiss all claims against Defendants on grounds of qualified immunity. (Dkt. #4.) Viewing the facts in the light most favorable to the Plaintiff, there is a question of fact as to whether Deputies Herrin and Woodrum, in employing deadly force, acted reasonably under the circumstances. The Defendants are not entitled

ORDER- 10

to either federal qualified immunity or state common law qualified immunity. Because Plaintiff has satisfied its burden under Fed. R. Civ. Pro. 56(f), the Court grants Plaintiff a discovery continuance on its claims against Kitsap County for 90 days from the date of this Order. Defendants' Motion for Summary Judgment on all claims (Dkt. #4) is therefore DENIED.

IT IS SO ORDERED.

IT IS SO ORDERED this 8th day of December, 2008.

　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　RONALD B. LEIGHTON
　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE
　　　　　　　　　　　　　　　　　　　*digitally signed upon authorization (JAB)*

ORDER- 11